FILED

2012 Mar-30  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MERRI WALLER.,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )          Case No. 2:10-CV-01249-TMP
                                        )
ALLSTATE INSURANCE CO.,                 )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION

This matter is before the court on the motion for summary judgment filed by defendant Allstate Insurance Company ("Allstate").  (Doc. 24).  The defendant has supported its motion with a brief and evidentiary materials.  (Doc. 25).  The plaintiff has filed an opposition to the motion for summary that is also supported with evidentiary material.  (Docs. 29, 30).   In reply to the plaintiff's opposition, the defendant has filed a responsive brief.  (Doc. 31).   The parties have consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).  Having reviewed the arguments, evidence, and pleadings in this matter, the undersigned finds that the motion is due to be denied as to plaintiff's breach of contract claim and granted as to plaintiff's bad faith claim.

I.  Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

1

as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify

2

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d

256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


II.  Summary Judgment Facts

Applying these standards to the evidence in the record, the following facts are taken favorably to the non-moving plaintiff, and inferences are drawn in favor of the non-moving plaintiff.

This is an insurance case where the coverage dispute arises out of a house fire that occurred on September 20, 2009, at 3240 Pine Hill Road, Moody, Alabama.  The home was owned by Sarah Shires with a joint right of survivorship with her daughter, Merri Waller.  Six days prior to the fire, on September 14, 2009, Shires passed away.  At the time of her death, Shires lived with her daughter in Pittsburgh, Pennsylvania.  Shires moved out of the Alabama residence in 2005 or 2006.  (Doc. 25-9, Exh. I, Waller Depo. p. 12).  After she moved out of the home, her granddaughter, Valerie Dunning, lived at the residence for at least one year.  Dunning moved out of the home at some point in 2008.  (Doc. 25-9, Exh. I, Waller Depo. p. 12).  No one was living at the home in September 2009 when it caught fire and was heavily damaged.

4

After her mother's death, Waller assumed possession of the property and provided notice of the fire to the defendant, Allstate Indemnity Company ("Allstate") on September 21, 2009.  Allstate insured the subject property under a homeowner's insurance policy.  Since the inception of the policy, the premium notices for this Alabama residence were mailed to Pittsburgh, Pennsylvania. There is no dispute that the insurance policy at issue in this litigation was in force at the time of the loss.

It is undisputed that no one resided at the Moody residence for at least thirty days preceding the fire.  In fact, the evidence establishes that no one lived at the home at any time after Dunning moved out in 2008. Waller paid Larry Paul, a neighborhood resident, to oversee and take care of the home after her mother moved away from the residence.  Paul would oversee the property, which included keeping up the yard and making minor repairs to the home.  Paul had keys to the house and Waller considered him the caretaker of the home.

In June 2009, Paul contacted Karen Menefee, who was a licensed general contractor at the time, to undertake repair work on the Shires' home.[1]  Menefee owned K&M Enterprises, a janitorial services and renovation business.  A few days after Paul contacted Menefee, they visited the property in order for Menefee to assess the condition of the home.  Menefee's objective was to determine the repairs necessary to get the home ready to be put on the market.  After Menefee surveyed the house, she spoke with Waller about the projected work and a budget for the scope of work contemplated. Menefee and Waller agreed on a budget of $3000 to $4000 dollars for the project.  They also agreed

_____

[1]Menefee testified that she held a general contractor's license at the time she was working on the subject property.  (Doc. 25-9, Exh. K, Menefee Depo. p. 12-13).  Menefee had the license for ten years and it expired in 2010.

5

that Menefee would be paid from the proceeds of the sale of the house, once it sold.  Menefee began

work on the home in July or August of 2009.

Menefee did not obtain a building permit in connection with the work she performed at the

subject property because, she testified, one is not necessary for "a small amount of work."  (Doc. 25-

9, Exh. K, Menefee Depo. p. 74).   Menefee also testified, however, that some of the work she

undertook was a "pretty big job" that she would not consider as a minor repair.  (Doc. 25-9, Exh. K.,

Menefee Depo. p. 112-113).  Menefee was still completing the repairs to the home on September 20,

2009, when it caught on fire.

The evidence establishes that the repairs Menefee undertook at the subject property included

the following:

- replacing the kitchen ceiling from where it had collapsed;

- replacing part of the kitchen floor;

- replacing the bedroom ceiling;

- replacing the rotten floor in washroom (which required replacing the entire subfloor, replacing the decking and replacing the tile);

- replacing baseboards in some of the rooms;

- replacing the rafters above the kitchen ceiling;

- adding joists above the kitchen ceiling;

- replacing all the tile in the kitchen;

- painting all the rooms in the house, except one; and

- "de-trashing" the basement.

Menefee testified that at the time of the fire she still had not completed all the projects she planned to undertake.  The unfinished work included painting the baseboards in the bathroom and completing the sunroom, a room that needed both windows and carpet replaced.  Menefee also testified that she had equipment in the house when it caught on fire.  That equipment included a power paint sprayer, remaining paint, paint rollers, paint pans, a duet pull saw, a skill saw, a drill, a generator, and two gas heaters.

*Facts Relevant to Allstate's Investigation of the Claim*

After Waller notified Allstate of the fire, it began a claim investigation.  The claim history submitted in support of Allstate's summary judgment motion, reports that Waller advised Allstate, on September 22, 2009, that the home was vacant and the property was for sale.  (Doc. 25-2, Exh. B, Claim History Report, p. 3).  Allstate assigned the claim to dwelling adjuster Mark Burchfield, who inspected the property and photographed the scene on September 24, 2009.  Allstate also retained certified fire investigator, Terry Beckham, to conduct an origin and cause examination at the subject property.[2]  Beckham went to the scene of the fire on September 28, 2009  to conduct a site examination.  At that time, he took photographs and determined that there was no electrical or gas service to the house.  Beckham testified that the lack of electrical or gas service to the house meant that he could eliminate those potential "heat sources" as a cause of the fire. That left Beckham with two potential theories to explain the cause of the fire: lightning or an intentionally-set fire.

---

[2]Beckham is a battalion chief with the Birmingham Fire and Rescue.  He has worked for that fire department for 27 years.  Beckham also has worked for PYRTECH as a certified fire investigator for approximately 12 to 13 years.

After Beckham completed his initial site inspection, he drove from the subject property to the Moody Fire Department. There, Beckham learned that it had rained on the night of September 20, 2009. While the firefighters did not report any lightning on the night of the fire, the fact that it had rained "caused [Beckham] concern that [he] may have a weather related fire." Based on this concern, Beckham conducted a lightning strike analysis by running a STRIKEnet report. STRIKEnet reports indicate whether the National Lightning Detection Network detected lightning for a given time period and location.[3] Elaborating on his decision to run a STRIKEnet report Beckham testified:

> I had information that it was raining at the time of the fire. I did not have any information regarding lightning, but I did have information for rain. Any time I get information that there was a weather front in the area, then I consider doing a lightning strike analysis to rule out lightning as a cause. And on this particular fire loss, other than lightning and intentionally set fire, there was no other cause.

In this case, Beckham generated two STRIKEnet reports for the subject property on the date of the fire. The first time Beckham ran a STRIKEnet report he used the mailing address of the subject property, 3420 Pine Hill Road, Moody, Alabama, 35004. The results of that report indicated that two lightning strikes were detected within a five mile radius of the mailing address, the parameter used by Beckham in generating the report. The first strike occurred at 11:09 p.m. and was

---

[3]Beckham testified that Vaisalia is the name of the company that generates the STRIKEnet reports. He elaborated that "[t]hey are a lightning detection network company that have the capabilities to detect lightning strikes all over the country on any given time and date. They have a website that you can do this online by putting in the parameters, an address or GPS coordinates, given a time span that you want those lightning – that lightning analysis to be done. You get immediate feedback whether or not there was lightning detected in the parameters that you had put in for the place." (Doc. 25-, Exh. D., Beckham Depo. p. 23).

located .9 miles from the mailing address.  The second strike was located 4.1 miles from the mailing address.

In the second STRIKEnet report, Beckham utilized the GPS coordinates for the subject property instead of the mailing address.  Beckham explained in his deposition that he was concerned that the mailing address did not "match up with the structure's location," so he decided to use the GPS coordinates for a more accurate location.[4]  (Doc. 25-4, Exh. D. Depo. p. 59).  The second STRIKEnet report also revealed two strikes detected within a five mile radius of the loss structure. The closest strike was detected 1.6 miles from the loss structure.  Beckham testified that both reports "put the structure outside of the confidence ellipse of the strike."  (Doc. 25-4, Exh. D. Depo. p. 59). Beckham reported to Allstate that the lightning strike analysis eliminated lightning as a cause of the fire.

While Beckham's investigation was ongoing, and prior to the submission of his final report regarding the origin and cause of the fire, Burchfield (the initial dwelling adjuster) requested that Allstate's Special Investigations Unit ("SIU") become involved in the investigation of the claim. SIU accepted the referral of the claim and SIU adjuster, Mike Rocchio, was assigned to the matter. The decision to involve SIU was informed by the fact that the property was vacant and Beckham's initial investigation had ruled out all natural heat sources as a cause of the fire.  Upon assignment of the claim, Rocchio conducted a physical inspection of the property and a neighborhood canvas,

---

[4]Beckham explained that when he first visited the scene of the fire the mailing address that he used in his GPS system did not take him to the exact location of the subject property.  Thus, he had concerns over the accuracy of the mailing address as an accurate indicator of the structure's location. When the first STRIKEnet report confirmed that there were lightning strikes within a 5 mile radius of the property, Beckham's concern about the potential inaccuracy of the mailing address prompted him to generate another STRIKEnet report utilizing GPS coordinates for added accuracy.

where he interviewed one gentlemen who reported the house had been empty for quite some time. Rocchio also took a recorded statement from Waller over the phone.  Waller stated that the house had not been occupied in 2 ½ years and that no property remained there.  Waller also stated that she had called an Allstate agent to advise that her mother had moved out of the house and to place a change of address request.  (Doc. 30-9, Exh. 4, p. 16).  Waller's statement was recorded on October 14, 2009.

On October 15, 2009, Beckham issued his report to Allstate and rendered an opinion that the "fire [was] incendiary in nature and was caused by the intentional ignition of combustible materials."[5]  (Doc. 25-3, Exh. C).  Rocchio agreed with Beckham's report and on January 29, 2010, Allstate wrote Waller advising that her insurance claim was denied. Allstate further advised that the cause of the fire was a "set fire" and, consequently, an act of vandalism that was excluded under the policy because the house had been vacant for more than 30 days prior to the fire.  The provision that Allstate relied upon to deny coverage provides:

> 8.   Vandalism and Malicious Mischief
>
> We do not cover vandalism or malicious mischief if your dwelling has been vacant or unoccupied for more than 30 consecutive days immediately prior to the vandalism or malicious mischief.  A dwelling under construction is not considered vacant or unoccupied.

---

[5]It is noted that Beckham did not consider the fire report from Moody Fire & Rescue as part of his analysis of the origin and cause of the fire.  He requested a copy of the report, but one was not available (or not completed) at the time Beckham rendered his opinion that the cause of the fire was incendiary.  Further, the court notes that Beckham did not report any findings as to what combustible materials were allegedly used to set the fire.

*Facts Relevant to the Cause and Origin of the Fire*

In support of its Motion for Summary Judgment, Allstate submits the report of fire investigator Terry Beckham, who opined that the subject fire originated in the left rear portion of the structure and "was caused by the intentional ignition of combustible materials." Plaintiff disputes that the fire was caused by arson and relies on the analysis of origin and cause expert, William "Chip" Bush.[6] Bush worked for Birmingham Fire & Rescue from 1975 until 1995. For six years prior to his departure from the department, Bush was a lieutenant fire investigator. He now owns and operates Bush Investigative Services, a company that conducts fire investigations. Plaintiff retained Bush to investigate the subject fire.

To investigate the subject fire, Bush reviewed and studied the photographs taken by Beckham. Bush also visited the Moody fire department on two occasions and interviewed Captain Littleton, the first firefighter to arrive at the scene of the fire. When Bush interviewed Littleton, he showed him the photographs from the burned property to refresh his memory of the fire. Littleton told Bush that he conducted a "walk around" of the property when he arrived at the scene and that the only fire he could see was coming from the back of the house. Littleton did not see any fire coming out of the windows. (Doc. 30-10, Exh. F, Bush Depo. p. 84). Bush did not visit the subject property because Littleton told him there was nothing there, that it was "clean." (Doc. 30-10, Exh. F, Bush Depo. p. 84).

Based on his experience, review of the scene photographs, and witness interviews, Bush classified the cause of the subject fire as "undetermined." He disagrees with Beckham's conclusion

---

[6]Allstate has moved to preclude plaintiff's expert. (Doc. 23). As set forth by separate order, Allstate's motion to preclude is denied.

that the fire "was caused by the intentional ignition of combustible materials" for several reasons, but primarily because there are no burn patterns in the kitchen.  For Bush, the lack of burn patterns emanating from the kitchen area (where Beckham believes the fire started) is inconsistent with the conclusion that the fire started from someone piling up combustibles and setting them on fire.  Bush testified: "I don't see fire patterns on the inside of the structure to indicate to me that that's what happened."  Bush also testified that if you piled up a "bunch of combustible material" and set it on fire in a room with a window, then the fire is going to exit out of the window.  (Doc. 30-10, Exh. F, Bush Depo. p. 106).  In this case, the fire did not exit out of the windows, indicating to Bush that it started inside a wall or an electrical box that got energized by a surge of electricity through a lightning strike.  (Doc. 30-10, Exh. F, Bush Depo. p. 184).  He also considers the "intense discoloration" of  metal on the meter base as indicative of lightning.  Bush classifies the fire as undetermined, however, he testified that it was "very possible" that a lightning strike caused the fire. Bush further testified that he may have "absolutely called it a lightning strike" had he looked at the scene.[7]  (Doc. 30-10, Exh. F, Bush Depo. p. 158).

In opposing summary judgment, plaintiff also submitted an affidavit from John Davis, a resident of Pinehill Road  who lived  "one house over from" the subject property.  (Doc. 30-4, Exh. D, Davis Aff. p. 1).  Davis attests that on the night of September 20, 2009, he was on his back porch, smelled smoke, and then noticed that the subject property was burning on the side of the house where

---

[7]The court notes, for the record, that Bush questions the accuracy of the lightning detection reports relied upon by Beckham to eliminate lightning as a cause of the fire.  He testified that he has seen the reports "miss" too many times in his experience.  The court further notes that Bush disagrees with Beckham's origin and cause report because it concludes that the fire was caused by the intentional ignition of combustible materials and there is no evidence of any combustible materials that were used in the fire.

the electrical box was located. At the time Davis smelled the smoke, it had been raining and lightning in the area.  Davis did not see any fire come out of the windows of the burning house.

III.    Allstate's Summary Judgment Motion

Allstate has moved for summary judgment on all the claims filed against it.  (Doc. 24). Plaintiff concedes that Allstate is entitled to summary judgment on the claims of negligent adjustment of a claim and negligent supervision of employees; leaving the breach-of-contract and bad faith claims for adjudication.  (Doc. 29).

a.  Breach-of-Contract

Allstate's summary judgment motion turns on the proposition, as it must, that plaintiff's breach of contract claim fails as a matter of law.  According to Allstate, the reason the claim fails is due to the vacancy of the property at the time of the fire and evidence that the fire was intentionally set – two factors, it contends, that disqualify a claim from coverage under the subject policy's vandalism exclusion.  Plaintiff opposes summary judgment by arguing three principal points: (1) the vandalism exclusion is ambiguous, (2) the property was under construction at the time of the fire, and (3) the cause of the fire should have been classified as "undetermined," not intentionally-set.  The adverse positions taken by the parties raise issues concerning the validity and reach of the vandalism exclusion – these issues, however, are ancillary to the central inquiry of causation.

The subject insurance policy provides that it covers "sudden and accidental direct physical loss to property" caused by "fire or lightning."  The policy does not, however, provide coverage for instances of vandalism or malicious mischief if:

> . . . [the insured] dwelling is vacant or unoccupied for more than 30 consecutive days immediately prior to the vandalism or malicious mischief.  A dwelling under construction is not considered vacant or unoccupied.

Under both the coverage provision (fire and lightning) and the coverage exclusion (vandalism in a vacant home), causation drives the coverage inquiry.  Because Allstate is relying on a coverage exclusion, it ultimately bears the burden of proving its applicability.  See Acceptance Insurance Co. v. Brown, 832 So. 2d 1, 12 (Ala. 2001)("In general, the insurer bears the burden of proving the applicability of any policy exclusion."); see also Fleming v. Alabama Farm Bureau Mutual Casualty Insurance Co., 293 Ala. 719, 310 So. 2d 200, 202 (1975).  If the fire was caused by lightning there is coverage regardless of vacancy, but if the fire was caused by vandalism or malicious mischief there is no coverage for property that was vacant for 30 consecutive days.  Thus, the seminal question is what caused the fire, and Allstate bears the burden of proving that it was not an accidental fire.

In this case, both parties have submitted evidence supporting different theories on causation.  Allstate concludes that the fire was intentionally set and has submitted evidence in the form an origin and cause report that substantiates that conclusion.  Plaintiff contends that the cause of the fire cannot be determined, submitting evidence from its expert it was "very possible" a lightning strike caused the fire.  Plaintiff's expert further testified that he may have "absolutely called it a lightning

strike" had he looked at the scene.  (Doc. 30-10, Exh. F, Bush Depo. p. 158).  In short, the experts disagree as to the cause of the fire.  These divergent opinions showcase the hallmark of summary judgment analysis — whether a material fact is genuinely disputed.  Here, the cause of the fire is not only disputed, but also material to the issue of Allstate denying plaintiff's insurance claim.  Given the factual dispute over the cause of the fire, the jury, not this court, must decide whether Allstate appropriately denied the plaintiff's claim.  To that end, the jury can weigh the evidence and evaluate the expert testimony, deciding which expert they believe and what theory of causation most likely explains how and why the subject property burned.  Stanolind Oil & Gas Co. v. Kimmel, 68 F.2d 520, 522 (10th Cir. 1934) ("It is the province of the jury, and not the court, to weigh the evidence, and, where there is a conflict, decide that which it would believe, and give such credence to the so-called theorists or experts, as in its judgment it deems fair and just.").

Because there is a fact question as to what caused the fire, the court cannot rule, as a matter of law, that Allstate properly denied the plaintiff's claim under the vandalism exclusion.  Although Bush offers only a "likely" cause of the fire, the court cannot say that Allstate's evidence relating to the cause is so overwhelming that no reasonable juror could accept the plaintiff's alternative theory, and thus there remains a justiciable issue of fact.  Again, the vandalism exclusion is only implicated if the fire was intentionally set — and here there is conflicting evidence as to causation.[8]

_____

[8]While the threshold dispute in this case concerns causation, the court notes at least one additional fact dispute that also stands in the way of summary judgment.  The vandalism exclusion at issue contains an exception whereby a property that is "under construction" is exempted from the exclusion.  Thus, the parties also dispute whether the subject property was under construction.  Allstate maintains that any work being done to the property was minor and does not rise to the level of construction contemplated by the exception.  By submitting invoices and itemizing repairs, the plaintiff has presented evidence that the repair work undertaken at the home qualifies as "under construction" for purposes of the exception.  Evidence the work involved replacing joists and rafters and sub-flooring at least presents a triable issue whether it went beyond mere minor repairs.  The

Given the evidence before the court at this juncture, a reasonable juror could find that there is insufficient evidence that the fire was intentionally set.  A reasonable juror could conclude, based on plaintiff's evidence, that Allstate had failed to prove that the fire was intentionally set and, therefore, that the vandalism exclusion applied.  It is at least conceivable that a reasonable juror could find that lightning caused the fire.  Because a reasonable juror could find that the fire was caused by some reason other than being intentionally set, a reasonable juror could, concomitantly, find that the defendant breached its insurance contract by failing to pay the plaintiff's claim.  Consequently, the defendant's motion for summary judgment is due to be denied on the breach-of-contract claim.

### b.  Bad Faith

Plaintiff claims that Allstate acted in bad faith by failing to pay her insurance benefits under a homeowner's policy that was in force at the time the insured property was destroyed.  Specifically, plaintiff alleges that "no arguable reason exists that would preclude the coverage of the said loss and the honoring of the said claim and as such the Defendants are guilty of a bad faith failure to honor and pay . . . ."  (Doc. 1, Compl. ¶ 20).  The defendant seeks summary judgment on this claim, arguing that when it denied the claim it had a legitimate basis for believing that the vandalism and malicious mischief policy provision applied to exclude the claim.  The defendant also contends that

---

policy does not define the term "under construction" and plaintiff also argues that it is ambiguous. Whether the evidence substantiates plaintiff's claim that the house was under construction is another question for the jury; and, to the extent the term is ambiguous, the Alabama Supreme Court has determined that where an insurance contract provision is "ambiguous in any way, the meaning of the contract presents a question of fact for the jury to resolve."  Employees' Benefit Assoc. v. Grisset, 732 So. 2d 968, 975 (Ala. 1998).

the evidence establishes a thorough investigation by Allstate prior to rendering a decision on the plaintiff's claim.

Under Alabama law, a bad faith claim usually requires that the plaintiffs show that they are entitled to a directed verdict on the contract claim. Chavers v. National Security Fire & Casualty Co., 405 So. 2d 1 (Ala. 1981). This requirement is part of the "normal" bad faith case; however, in the "extraordinary" or "abnormal" case, Alabama recognizes that bad faith may be established where the plaintiffs show the "insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." See, e.g., Taylor v. Prudential Insurance Co. of America, 775 F.2d 1457, 1458-59 (11th Cir. 1985). To recover under a theory of an abnormal case of bad faith failure to investigate an insurance claim, and insured must show: "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." Acceptance Insurance Co. v. Brown, 832 So. 2d 1, 16 (Ala. 2001). The abnormal cases of bad faith "have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claims." State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 306 (Ala. 1999). It is the "abnormal" case of bad faith that plaintiff seeks to prove in the instant litigation.

In opposition to summary judgment, plaintiff attempts to prove abnormal bad faith by arguing that: (1) Allstate recklessly failed to investigate the claim because the defendant never asked plaintiff

17

if the home was under construction at the time of the fire; (2) Allstate's investigator failed to follow a "Causation Investigation Guide" and therefore did not complete his investigation; (3) Allstate's investigator concluded the fire was incendiary before he received the results of the second lightning strike analysis report; and (4) Allstate relied upon an ambiguous vacancy exclusion to deny the subject claim. The court is unpersuaded that any of these allegations, even if true, constitute abnormal bad faith as contemplated under Alabama law.

Plaintiff contends that the failure of SIU adjuster, Mike Rocchio, to ask the plaintiff if the subject home was under construction evidences abnormal bad faith. The court disagrees. The evidence before the court is that Rocchio took a recorded statement from the plaintiff where she stated that the house had not been occupied in 2 ½ years and that no property remained there. Rocchio also testified:

> A.   Okay.   So if Ms. Waller, who I took a recorded statement from, indicated that the property was empty and vacant for a period of three years, that there were no utilities hooked up to the property, and never said anything about any renovation or reconstruction or remodeling or what have you, then why would I address that if it as not brought into the equation.

(Doc. 30-2, Rocchio Depo. p. 94). At most, the court finds that any shortcomings in Rocchio's questioning of the plaintiff evinces bad judgment, not bad faith. Similarly, the alleged failure of Rocchio to follow a manual, which allegedly would have prompted a discussion about any remodeling or renovation, may constitute bad judgment or negligence, but it does not constitute bad faith. Slade, 747 So. 2d at 303-04 ("That [the defendant] might not have strictly complied with the

letter of the claims manual under the circumstances here presented may indicate bad judgment or negligence, but more than bad judgment or negligence is required in a bad-faith action.").

Plaintiff also claims bad faith on the basis of "undeniable" evidence that Allstate fabricated a reason to deny her claim. Proof of the fabrication, plaintiff claims, is a discrepancy about when Allstate's fire investigator (Beckham) determined the cause of the fire. Beckham testified that he did not determine the cause of the fire until after he received the results of the second lightning detection report. The record indicates, however, that Beckham verbally reported to Allstate that the cause of the fire was incendiary two days prior to receiving the second test results. This inconsistency, plaintiff argues, is undeniable evidence that Allstate fabricated a reason to deny her claim. The court cannot agree. Both lightning detection reports eliminated lightning as a cause of the fire. So, even if Beckham concluded that the fire was incendiary before he received the results from the second detection report, he did so based upon the information from the first report which, for Beckham, ruled out lightning as a cause of the subject fire. Beckham's opinions did not change on the basis of the second report and there is no evidence of fabrication on Allstate's part. Simply put, the court cannot connect the necessary dots between the allegation that Allstate committed bad faith, by fabricating a reason to deny the claim, and Beckham's testimony.[9] If the record contradicts

_____

[9]The court fails to see the connection between Beckham reporting the cause of the fire prior to receiving results from the second report and Allstate fabricating a reason to deny the claim. Perhaps, if Beckham ruled out lightning prior to receiving any results from the detection reports, then plaintiff's allegation would be more comprehensible. In this case, however, the first report had already eliminated lightning as a cause when Beckham reported his conclusion to Allstate. The second report merely confirmed the results of the first report and, if anything, evidences a thorough investigation by someone wanting to double-check the results of the first report. Thus, even if Beckham did determine the cause of the fire before receiving the second report's results, his conclusion was nonetheless made on the basis of the results from the first report, and nothing in the second report undermines that conclusion.

Beckham's sworn testimony, then that is an issue of credibility that the jury can assess at the trial on plaintiff's breach of contract claim; but, it is not substantial evidence of abnormal bad faith.

Lastly, plaintiff contends that Allstate is guilty of abnormal or extraordinary bad faith on grounds that it relied on an ambiguous policy exclusion to deny her claim. Plaintiff claims that the vacancy exclusion is ambiguous because a "policy holder could misinterpret arson as a separate peril not be included in the vandalism or malicious mischief peril section of the policy."[10] Under Alabama law, "[t]he terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning." Slade, 747 So. 2d at 308-09 (internal citations omitted). Here, plaintiff argues that the vandalism exclusion is ambiguous as to whether it includes intentionally-set fires. Plaintiff's claim of ambiguity raises the issue of whether a reasonably prudent person applying for insurance would have understood the term "vandalism or malicious mischief" to include arson.

In this case, vandalism is not defined in the subject insurance policy. Alabama precedent instructs, however, that "[i]n determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous." Slade, 747 So. 2d at 309 (internal citations omitted). To discern the "common meaning" of vandalism and arson, the court considers dictionary definitions. Emergency Aid Insurance Co. v. Dobbs, 83 So.2d 335 (1955) ("In determining the common meaning of the terms of an insurance policy, this Court has looked to dictionary definitions."). Webster's Dictionary defines vandalism as "willful or malicious destruction

---

[10]Plaintiff also contends that the term "under construction" is clearly ambiguous and susceptible to more than one interpretation. The term "under construction" appears as an exception to the vandalism exclusion. Because Allstate did not rely on that term to deny coverage, the court will not consider it at this juncture.

or defacement of public or private property" and arson as "the willful or malicious burning of property (as a building) esp. with criminal or fraudulent intent." Merriam-Webster's Collegiate Dictionary 1383 (11th ed. 2009). Both vandalism and arson are similarly defined, suggesting that the common meaning of vandalism would include arson. The Eleventh Circuit appears to concur, holding that "a common sense interpretation of the insurance contract's 'Vandalism or Malicious Mischief' which contains the 'vacancy' exclusion, suggests that it would apply to a fire set in a vacant house by an unknown arsonist or vandal." American Mutual Fire Insurance v. Durrence, 872 F.2d 378, 379 (11th Cir. 1989). Based on the fact that vandalism and arson are similarly defined, and the fact that the Eleventh Circuit has interpreted a vandalism provision to include an intentionally-set fire, the court finds that a "rational and practical construction" of the vandalism exclusion includes intentionally-set fires.[11] Slade, 747 So. 2d at 309, citing Green v. Merrill, 308 So. 2d 702 (Ala. 1975) (". . . the terms of an insurance policy should be given a rational and practical construction.). Consequently, the court does not find ambiguity that would support a claim of extraordinary bad faith.[12]

---

[11]Alabama law also instructs that "a court cannot consider the language in the policy in isolation, but must consider the policy as a whole." Slade, 747 So. 2d at 309, citing Turner v. United States Fidelity & Guar. Co., 440 So. 2d 1026 (Ala. 1983). In this case, the preamble to the coverage provision (from which vandalism is excluded) provides: "[w]e will cover sudden and accidental direct physical loss to the property . . . caused by: 1. Fire or Lightning . . . ." Plaintiff argues that arson could be construed as falling under the fire or lightning provision (as well as the vandalism exclusion) and therefore the policy is ambiguous. As set forth above, the court does not find that vandalism is ambiguous based on the dictionary definitions and Eleventh Circuit precedent. Further, construing the policy as a whole, the court does not find that arson is either "sudden" or "accidental," as required by the preamble for coverage under the fire or lightning provision.

[12]The Alabama Supreme Court has held that in a "normal" case of bad faith, an insurer "cannot use ambiguity in the contract as a basis for claiming a debatable reason not to pay the claim." Grissett, 732 So. 2d at 967. While the court's mention of ambiguity in Grissett was in the context of a normal case of bad faith, the dialogue regarding ambiguity has since appeared in the

The decision to dispense with the directed verdict breach-of-contract predicate in certain bad faith cases was informed by "extraordinary" circumstances where the Alabama Supreme Court found that it would be inappropriate to "allow the insurer to obtain a judgment as a matter of law on the bad faith claim by putting on evidence sufficient to defeat the plaintiff's motion for directed verdict on the breach of contract claim." Thomas v. Principal Financial Group, 566 So. 2d 735, 745 (Ala. 1990). In such circumstances, a plaintiff unable to prove the requirements necessary to establish a "normal" case of bad faith, could instead "prove that the insurer's failure to investigate at the time of the claim presentation was intentionally or recklessly omissive." Employees' Benefit Association v. Grisset, 732 So. 2d 968, 977 (Ala. 1998). The evidence in this case establishes that Allstate initiated an investigation into plaintiff's claim, contracted with a certified fire investigator to conduct an origin and cause examination of the property, conducted two lightning detection reports, transferred the investigation to Allstate's Special Investigations Unit for further investigation, and had two different adjusters physically inspect the property. This evidence stands in sharp contrast to cases of extraordinary bad faith, like Slade, where the defendant insurance company never, in the course of its investigation, sent anyone to the plaintiff's home who was qualified to conduct a lightning investigation, never interviewed any witnesses that were present, and never investigated

---

abnormal bad faith decisions. See Slade 747 So. 2d at 307-10, 315. In both contexts, however, it seems that the point the court is trying to make is that an insurer cannot use ambiguity in a contract to its advantage. See Grissett, 747 So. 2d at 976-977 (an insurer cannot use ambiguity as a basis for claiming a debatable reasonable because "[o]therwise, an insurer would have the incentive to write ambiguous policies in order to create an absolute defense to a bad-faith claim."). Here, Allstate maintains that the contract terms are clear and unambiguous; there is no effort, for example, to claim ambiguity as a justification for its interpretation of the contract and the consequent denial of the plaintiff's claim. Accordingly, the court does not perceive this case as one where the insurer is attempting to use the ambiguity of an insurance contract to its advantage. Thus, for this additional reason, summary judgment is due with regard to the claim of extraordinary bad faith.

lightning as a cause of the fire.  <u>Slade</u>, 747 So. 2d at 315.   Here, there are allegations of an incomplete investigation, but there is no evidence substantiating that Allstate " . . . recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." <u>Employees' Benefit Association v. Grisset</u>, 732 So. 2d 968, 977 (Ala. 1998), citing <u>Blackburn v. Fidelity & Deposit Co. of Maryland</u>, 667 So. 2d 661 (Ala. 1995).  Further, there is no evidence of "dishonest purpose" or "ill-will" to corroborate plaintiff's bad faith allegations. <u>Slade</u>, 747 So.2d at 303-04, citing <u>Gulf Atlantic Life Insurance Co. v. Barnes</u>, 405 So. 2d 916, 924 (Ala.1981) ("'Bad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'").  For these reasons, the court is unpersuaded that the facts of this case represent the type of reckless and intentional misconduct contemplated under Alabama law for actions of extraordinary bad faith.  Consequently, Allstate is entitled to summary judgment on plaintiff's claim of extraordinary bad faith.

IV.   <u>Conclusion</u>

Accordingly, consistent with the foregoing discussion of the evidence presented by defendants in support of the motion for summary judgment, and in light of the plaintiff's submission in response, this court determines that genuine issues of material fact exist as to whether the defendant breached the contract of insurance with the plaintiff and therefore summary judgment is DENIED on the breach-of-contract claim.  Regarding the bad faith claim, the court finds that the plaintiff has failed be present substantial evidence of bad faith and therefore summary judgment is GRANTED on that claim.  On the agreement of the plaintiff, the court also GRANTS summary

judgment as to plaintiff's claims of negligent adjustment of a claim and negligent supervision of employees.

A separate order will be entered in accordance with the findings set forth herein.

Dated this 30th  day of March, 2012.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

24